UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

WESLEY NELSON,                      )
                                    )
        Plaintiff,                  )
                                    )       No. 4:05CV01481 FRB
                                    )
v.                                  )
                                    )
                                    )
JO ANNE B. BARNHART,                )
Commissioner of Social Security,    )
                                    )
        Defendant.                  )

**MEMORANDUM AND ORDER**

        This matter is on appeal for review of an adverse ruling
by the Social Security Administration. All matters are pending
before the undersigned United States Magistrate Judge, with consent
of the parties, pursuant to 28 U.S.C. § 636(c).

**I.  Procedural Background**

        Plaintiff Wesley Nelson ("plaintiff") filed an application
for a period of disability and Disability Insurance Benefits ("DIB")
under Title II of the Social Security Act, and protectively filed
for Supplemental Security Income Benefits under Title XVI of the
Social Security Act on July 31, 2003.  (Tr. 38-40.)  Plaintiff
alleges that he became disabled as of September 20, 2000, due to
diabetes, emphysema, arthritis and kidney problems.  (Tr. 54.) On
initial consideration, the Social Security Administration denied
both of Plaintiff's applications for benefits on September 11, 2003.

- 1 -

(Tr. 26.)

On October 17, 2003, Plaintiff requested a hearing by an Administrative Law Judge ("ALJ"). (Tr. 32.) On November 30, 2004, a hearing was held before an ALJ, during which Plaintiff testified and was represented by attorney Frank J. Niesen, Jr. (Tr. 19-22; 150-175.) On April 16, 2005, the ALJ issued a decision unfavorable to Plaintiff, and Plaintiff filed a Request for Review of Hearing Decision with defendant Agency's Appeals Council on May 10, 2005. (Tr. 9-17; 7.) On July 16, 2005, the Appeals Council denied Plaintiff's request for review. (Tr. 4-6.) The ALJ's decision thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II. **Evidence Before the ALJ**

### A. Testimony of Plaintiff

At the hearing on November 30, 2004, plaintiff responded to questions from counsel and the ALJ. During questioning from his attorney, Plaintiff testified that he is five feet, nine inches tall and weighs 200 pounds, a weight higher than his usual weight of 189. (Tr. 158.) He testified that he was born on November 20, 1953, and was 51 years of age at the time of the hearing. (Tr. 153.) He is right-handed. (Tr. 158.) On May 4, 2004, he married Valerie Nelson, and they now live with plaintiff's granddaughter and her cousin, aged fourteen and ten, respectively. (Tr. 154.) From 1992 to 2000, plaintiff was married to his first wife, with whom he had

no children.  (Tr. 154-55.)  Plaintiff testified that he has two grown children, aged 20 and 25, who live in Kansas City, Missouri, and that he maintains telephone contact with them.  (Tr. 155.)

Plaintiff testified that, following his mother's death in 1965, he was raised by his grandmother and also spent some time in an orphanage called Providence House.  (Tr. 155-56.)  Plaintiff testified that, during his school years, he was placed in special education classes designed for "slow learners," and finished the eighth grade.  (Tr. 157.)  The last school plaintiff attended was Providence School at the Providence House orphanage.  Id.  Upon leaving there, plaintiff took a job as a painter.  Id.  At the time of the hearing, plaintiff was attending weekly GED classes at the Human Development Corporation in Wellston, but anticipated that it would be a long while before he took the GED examination.  (Tr. 157-58.)  Plaintiff currently receives $149.00 per month in food stamps. (Tr. 169.)

Plaintiff testified that, in addition to his painting work, he previously worked as a cook, dock worker and forklift truck operator.  (Tr. 159.)  Plaintiff has never had a driver's license, and relies upon either his wife or public transportation to take him various places.  Id.  Plaintiff testified that he is able to read and write "to some extent," but that he does not know all words. Id.

Plaintiff testified that he was incarcerated following a burglary conviction in 2000.  (Tr. 160.)  Following his release in

- 3 -

June 2003, he was sent to an "honor center" in Kansas City, where he was required to maintain employment and "stay clean." Id. While at the honor center, plaintiff worked four hours per day as an "in-house worker," washing clothes. Id. Plaintiff testified that he was selected for in-house work due to his breathing difficulties, poor eyesight, and pain. (Tr. 161.) Plaintiff's duties consisted of pushing a cart around the facility collecting laundry, transporting the laundry to the laundry room, and washing the clothing. Id. For this work, plaintiff received $120.00 per month.

Plaintiff testified that he uses a cane, prescribed by Dr. Cynthia Brown,[1] a physician at a free clinic. (Tr. 162.) Plaintiff testified that he visits the clinic monthly for medication, and visits the doctor for an examination every three months. Id. In 2001, while in the penitentiary, plaintiff was diagnosed with diabetes, and currently takes insulin twice per day. Id. Plaintiff testified that his diabetes causes him constant pain in his back, legs, hands and feet.[2] (Tr. 163.) Regarding his back pain, plaintiff stated that he currently takes Celebrex, which does not truly help the pain but merely "eases it a little." Id. Regarding the pain in his legs and feet, plaintiff testified that he feels

---

[1] Medical records from the Myrtle Hilliard Davis Comprehensive Health Center, a free clinic, indicate that plaintiff was seen by a Dr. Cynthia Brownfield. (Tr. 124-33.) The medical evidence of record contains no reference to a Dr. Brown. It is therefore apparent that the references to Dr. Brown actually refer to Dr. Brownfield.

[2] In his Disability Report, Form SSA-3368, plaintiff indicated that his foot problems were related to arthritis. (Tr. 58.)

"charley horses" in his feet after walking a block, and that the pain radiates from his feet up his legs and into his thighs. (Tr. 163-64.) Plaintiff further testified that, while doing any kind of work, his hands will occasionally "lock up." (Tr. 164.) At the time of the hearing, plaintiff was taking Amitriptyline,[3] Celebrex[4] and Tramadol.[5] Id.

Plaintiff further testified that he suffers from blurry vision, pain in his eyes, and "throbbing pain" in his head. (Tr. 164-65.) Plaintiff testified that he recently received new eyeglasses, which were paid for by his sister. (Tr. 165.)

Plaintiff testified that he uses Albuterol[6] twice per day due to the shortness of breath he feels when walking or pushing a vacuum cleaner. (Tr. 166.) Plaintiff further testified that he becomes dizzy while moving things or doing any kind of activity, and that he is bothered by fumes. (Tr. 166-67.) Plaintiff testified that his pain causes insomnia, and that he takes Amitriptyline to Control the pain and help him sleep, but that the drug causes him to feel "worn down." (Tr. 167, 172.) Plaintiff testified that he

---

[3]Amitriptyline is indicated for use in the treatment of depression. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682388.html

[4]Celebrex is indicated for the treatment of pain, swelling, tenderness and stiffness associated with osteoarthritis and rheumatoid arthritis. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a699022.html

[5]Tramadol is indicated for the management of moderate to moderately severe pain. *Physician's Desk Reference*, 55th Ed., 2001.

[6]Albuterol is indicated for the treatment of the symptoms of asthma, chronic bronchitis, emphysema, and other lung diseases. http://www.nlm.nih.gov/medlineplus/druginfo/uspdi/202095.html.

suffers from depression because he is "sick all the time." (Tr. 167-68.) Plaintiff further testified that, in 2003, he fell from his porch while installing holiday lights and injured his left knee, which may require surgery. (Tr. 167-68.)

Plaintiff testified that he can walk for approximately one block, and can stand for five or six minutes. (Tr. 168-69.) Plaintiff lives in a one-story home, but there are steps outside the home that he finds difficult to climb. (Tr. 169.) Plaintiff testified that he never runs the vacuum cleaner and that his wife does most of the housework, but that he occasionally sweeps the bathroom or uses the microwave oven. (Tr. 169-70.) Plaintiff accompanies his wife on shopping trips, but does not lift bags. (Tr. 170.) On a typical day, plaintiff rises at 8:00 or 9:00, has breakfast, takes his insulin, and generally spends the balance of the day watching football and news programs on television. (Tr. 171.) Plaintiff attends church three times per week, and also enjoys playing Monopoly, Sorry and card games, and reading his Bible. Id. Plaintiff is able to attend to his personal care, and does not drink. (Tr. 171-72.) Plaintiff reports to his parole officer on a monthly basis. (Tr. 172.)

Plaintiff then responded to a series of questions from the ALJ. Plaintiff testified that he had a prior criminal history involving burglaries, and that, in 1989, he was "in participation with somebody that had robbed a cab driver." (Tr. 173-74.) Plaintiff testified that his wife received disability payments, and

that he had been seeing "Dr. Brown" for about eighteen months. (Tr. 174.) At the request of plaintiff's attorney, the ALJ left the record open following the hearing to await receipt of additional medical and school records. (Tr. 152-53, 175.)

### III.    Medical Records[7]

Records from the Tipton Correctional Center in Tipton, Missouri indicate that plaintiff underwent laboratory tests on January 7, 2003, at which time he was diagnosed with type two diabetes. (Tr. 96-97.) On February 7, 2003, plaintiff was seen due to a broken denture, and impressions were taken so that the denture could be repaired. (Tr. 98.) On February 11, 2003, plaintiff was seen by a nurse, who applied dressings to the bilateral dorsal aspects of plaintiff's feet. (Tr. 99.) On February 13, 2003, plaintiff was seen with complaints of a cold and chest pain while coughing, and reported that he had recently been doing some upper body weightlifting. (Tr. 113.) Plaintiff was noted to have clear lungs and no cardiac history. Id. On February 14, 2003, plaintiff presented to the clinic for counseling regarding diabetes management. (Tr. 99.) On February 21, 2003, plaintiff presented

---

[7]Following the hearing, on December 20, 2004, plaintiff's attorney forwarded additional medical records from the Myrtle Hilliard Davis Health Center dated August 17, 2004 through November 4, 2004. (Tr. 134-38.) For the sake of consistency, these records are incorporated into the following summary. Furthermore, the record includes a copy of an unsigned, undated and incomplete "Residual Physical Functional Capacity Assessment," Form SSA-4734-U8. (Tr. 115-122.) At the initiation of the hearing, counsel for plaintiff objected to the admission of the form into evidence, and the ALJ sustained the objection. (Tr. 152-53.) This record will therefore be excluded from discussion herein.

for insertion of his repaired denture. (Tr. 100.) Plaintiff's denture was adjusted on February 28, 2003. (Tr. 101.) On March 6, 2003, plaintiff presented to the clinic requesting a renewal of his diet plan. (Tr. 102.) On April 8, 2003, plaintiff was seen by Dr. John Markovitz complaining of gastric reflux symptoms, occurring mostly at night, which were relieved by Zantac. (Tr. 104.) Upon exam, Dr. Markovitz noted plaintiff's lungs were clear. Id. Plaintiff was given TUMS antacid tablets. Id. On April 24, 2003, plaintiff was referred to an eye doctor for an annual diabetic retinal exam. (Tr. 105.) Laboratory tests dated May 7, 2003 indicate that plaintiff tested negative for microalbumin. (Tr. 106.) On this same date, plaintiff was given an Albuterol inhaler, although the records contain no explanatory statements concerning plaintiff's complaints or diagnosis. Id. On May 22, 2003, plaintiff was seen with complaints of feeling sick after taking medicine without eating lunch. (Tr. 112.) Plaintiff's blood sugar was noted to be low, and he was instructed to continue to monitor it. (Tr. 112-13.) On May 24, 2003, plaintiff was seen by Dr. Steven P. Thibon for an eye exam, and it was noted that plaintiff denied visual problems. (Tr. 109.) Dr. Thibon noted that plaintiff had no ocular complications of diabetes. Id. On June 11, 2003, plaintiff presented for HIV testing, the results of which were negative. (Tr. 111.) On June 13, 2003, plaintiff presented for repair of another broken denture. (Tr. 109.) Because plaintiff was scheduled for release on June 16, 2003, there was insufficient time

to send the denture to the lab, and no repair was initiated.  <u>Id.</u>

Records from the Myrtle Hilliard Davis Comprehensive Health Center ("clinic") indicate that plaintiff was seen by Cynthia Brownfield, M.D., on October 30, 2003, with complaints of intermittent, sharp pain in his back, head, legs and feet.  (Tr. 124.) The records indicate that plaintiff was not monitoring his blood sugar.  <u>Id.</u>  Plaintiff was given a refill of 70/30 insulin and referred for diabetic education.  (Tr. 125.)  Plaintiff was also given a refill of Accupril[8] and Amitriptyline, and was further diagnosed with GERD (gastroesophageal reflux disease), and given a trial of Pepcid.[9]  <u>Id.</u>

Plaintiff was seen again in the clinic on November 19, 2003 with complaints of "ophthalmology pain" and headache when reading.  (Tr. 126.)  Examination of plaintiff's eyes revealed no pathology, and no diabetic or hypertensive retinopathy.  (Tr. 126.) On January 30, 2004, plaintiff presented to the clinic for an insulin refill, and further complained of pain in his left leg following a fall two weeks ago.  (Tr. 127.)  X-rays of plaintiff's left knee revealed tiny bone spurs at the margins of the articular plate of the patella and at the intercondylar eminences of the tibia, and a faint suggestion of a probability of a loose body in

---

[8]Accupril is indicated for use in the treatment of hypertension.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a692026.html

[9]Pepcid is indicated for use in the treatment of GERD.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a687011.html

the joint space. (Tr. 133.) There was no evidence of any bone injury. Id. The impression was early minimal osteoarthritis of the left knee. Id. Plaintiff was diagnosed with an MCL injury, and was given crutches and a prescription for Celebrex. Id. Plaintiff was further diagnosed with impotence, and given a trial of Viagra.[10] (Tr. 128.) On May 25, 2004, plaintiff saw Dr. Brownfield, who noted crepitation in his left knee. (Tr. 129.) Plaintiff's prescriptions for insulin, Accupril, Pepcid and Celebrex were renewed, and plaintiff was given Ultram[11] and referred to an orthopedist. Id. Dr. Brownfield specifically noted that plaintiff needed to control his diabetes. Id.

The clinic records indicate that plaintiff was seen again on June 22, 2004 in podiatry, but it is unclear from the records what plaintiff's complaints were or what diagnosis was made. (Tr. 132.) Plaintiff's treatment for diabetes and hypertension were noted, and it appears that plaintiff's prescriptions were renewed and that he was instructed to return to the clinic in four months. Id. On June 24, 2004, plaintiff was seen in the clinic with complaints of blurry vision for the past nine months, following losing his eyeglasses while incarcerated. (Tr. 131.) Plaintiff was given an eyeglass prescription. Id. On July 26, 2004, plaintiff

---

[10]Viagra is indicated for use in the treatment of erectile dysfunction. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a699015.html

[11]Ultram is indicated for use in pain management. http://www.nlm.nih.gov/medlineplus/druginfo/uspdi/202789.html

visited Dr. Brownfield, who renewed his prescriptions. (Tr. 132.)

On August 17, 2004, plaintiff saw Dr. Brownfield and was given insulin and syringes, and his Amitriptyline was increased. (Tr. 135.) Similarly, on September 20, 2004, plaintiff's insulin and Amitriptyline were renewed. Id.

On October 28, 2004, plaintiff was seen in the clinic for diabetes management. Id. Plaintiff also complained of pain and stiffness in his left knee, wrist and shoulder, and reported that Celebrex helped somewhat. Id. It was noted that plaintiff was using a cane. (Tr. 135.) Plaintiff also described lower back pain upon bending, with some decreased sensation on the left side. Id. Plaintiff further reported shortness of breath upon exertion or stair climbing, and a chronic cough. (Tr. 136.) The doctor's notes indicate that these symptoms began two months ago when plaintiff resumed smoking one pack of cigarettes per day. Id. X-rays of plaintiff's left knee revealed minimal osteoarthritis of the left knee, and chest films revealed minimal interstitial infiltrates at the right pulmonary base, but were otherwise normal. (Tr. 138.) Plaintiff was diagnosed with osteoarthritis and referred to an orthopedist, and was prescribed Cipro[12] for his cough. (Tr. 136.) The final progress note, dated November 4, 2004, indicates an orthopedic referral. (Tr. 137.)

**IV.    The ALJ's Decision**

---

[12]Cipro is indicated for use in the treatment of bacterial infections. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a688016.html

The ALJ found that plaintiff had not engaged in substantial activity since September 20, 2000. (Tr. 13, 16.) The ALJ determined that plaintiff had severe asthma, but that he did not have an impairment or combination of impairments contemplated by the Regulations which would direct a finding of disability. (Tr. 16.) The ALJ found that plaintiff could not perform his past relevant work as a factory worker and cook. (Tr. 17.) The ALJ determined that plaintiff had the residual functional capacity to "perform work activity at all exertional levels," but that plaintiff had "some nonexertional limitations, namely, he would be limited to avoiding concentrated exposure to pulmonary irritants, temperature extremes, and humidity, due to his respiratory condition." (Tr. 16.) The ALJ determined that plaintiff's non-exertional limitations compromised plaintiff's ability to perform work at all exertional levels. Id. Considering plaintiff's age, education, and work experience, in combination with the range of work at all exertional levels that plaintiff remained functionally capable of performing, and using Appendix 2, Subpart P, Regulations No. 4, § 204.00 as a framework for decision-making, the ALJ found that plaintiff could make a vocational adjustment to perform work which exists in significant numbers in the national economy. Id.

The ALJ found that plaintiff's allegations that he was unable to work were inconsistent with the preponderance of the medical evidence of record. (Tr. 16.) The ALJ further found that plaintiff's left knee pain was non-severe, because testing revealed

only minimal osteoarthritis, no physician set forth any restrictions related to the knee, and because the knee did not significantly limit plaintiff's ability to perform work activity. (Tr. 15.) Similarly, the ALJ found that plaintiff's diabetes was non-severe, as it was controlled with insulin and produced no end organ damage or neuropathy. Id. The ALJ noted the absence of any significant clinical signs typically associated with disabling pain, and noted that no doctor ever stated or implied that plaintiff was totally incapacitated. Id. The ALJ found that plaintiff's activities of daily living were limited by his own choice, and further noted that no doctor ever limited plaintiff "to such a significant degree, or in fact, to any degree at all." Id. As a result, the ALJ found that plaintiff was not disabled, and had not been under a disability as defined in the Social Security Act, at any time through the date of his decision. (Tr. 16-17.)

## V.    Discussion

To be eligible for Social Security disability benefits and Supplemental Security Income under the Social Security Act, plaintiff must prove that he is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Secretary of Health & Human Services, 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner utilizes a five-step evaluation process. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987). The Commissioner begins by considering the claimant's work activity. If the claimant is engaged in substantial gainful activity, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe impairment," meaning one which significantly limits his ability to do basic work activities. If the claimant's impairment is not severe, then he is not disabled. The Commissioner then determines whether claimant's impairment meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment is equivalent to one of the listed impairments, he is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant has the residual functional capacity to perform his or her past relevant work. If so, the claimant is not disabled. If not, the burden then

shifts to the Commissioner to prove that there are other jobs that exist in substantial numbers in the national economy that the claimant can perform. Pearsall, 274 F.3d at 1217; Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000). Absent such proof, the claimant is declared disabled and becomes entitled to disability benefits.

The Commissioner's findings are conclusive upon this Court if they are supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Young v. Shalala, 52 F.3d 200 (8th Cir. 1995); citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993). Substantial evidence is less than a preponderance but enough that a reasonable person would find adequate to support the conclusion. Briggs v. Callahan, 139 F.3d 606, 608 (8th Cir. 1998). To determine whether the Commissioner's decision is supported by substantial evidence, the Court must review the entire administrative record and consider:

1.   The credibility findings made by the ALJ;

2.   The plaintiff's vocational factors;

3.   The medical evidence from treating and consulting physicians;

4.   The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments;

5.   Any corroboration by third parties of the plaintiff's impairments;

6.   The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth the plaintiff's impairment.

<u>Stewart v. Secretary of Health & Human Services</u>, 957 F.2d 581, 585-86 (8th Cir. 1992); <u>quoting</u> <u>Cruse v. Bowen</u>, 867 F.2d 1183, 1184-85 (8th Cir. 1989).

The Court must also consider any "evidence which fairly detracts from the ALJ's findings." <u>Groeper v. Sullivan</u>, 932 F.2d 1234, 1237 (8th Cir. 1991); <u>see also</u> <u>Briggs</u>, 139 F.3d at 608. However, where substantial evidence supports the Commissioner's decision, the decision may not be reversed merely because substantial evidence may support a different outcome. <u>Briggs</u>, 139 F.3d at 608; <u>Browning v. Sullivan</u>, 958 F.2d 817, 821 (8th Cir. 1992); <u>citing</u> <u>Cruse</u>, 867 F.2d at 1184.

In the case at bar, Plaintiff claims that the ALJ failed to fully and fairly develop the record because he did not order a consultative examination of plaintiff, and that the ALJ erroneously assessed plaintiff's credibility by improperly relying upon his personal observations, and by ignoring clinical findings of neuropathy.

A.  <u>Fully and Fairly Develop the Record</u>

Plaintiff claims that the ALJ failed to fully and fairly develop the record because he did not order a consultative examination of plaintiff.  It is the ALJ's duty to fully and fairly develop the record, even when the claimant is represented by counsel. <u>Snead v. Barnhart</u>, 360 F.3d 834, 836-37 (8th Cir. 2004); <u>see</u> <u>Freeman v. Apfel</u>, 208 F.3d 687, 692 (8th Cir. 2000).  Included in this duty is the responsibility of ensuring that the record

includes evidence from a treating physician, or at least an examining physician, addressing the particular impairments at issue. Nevland, 204 F.3d at 858; see Strongson v. Barnhart, 361 F.3d 1066, 1071-72 (8th Cir. 2004). The ALJ is required to order a consultative examination when one is necessary to allow the ALJ to make an informed decision. Freeman, 208 F.3d at 692; Haley v. Massanari, 258 F.3d 742 (8th Cir. 2001). The Regulations require an ALJ to order a consultative examination when the evidence as a whole, both medical and non-medical, is insufficient to support a decision on a claim. 20 C.F.R. § 404.1519(b). "Unfairness or prejudice resulting from an incomplete record -- whether because of lack of counsel or lack of diligence on the ALJ's part -- requires a remand." Highfill v. Bowen, 832 F.2d 112, 115 (8th Cir. 1987); citing Kane v. Heckler, 731 F.2d 1216, 1220 (5th Cir. 1984). A review of the circumstances of this case reveals that the ALJ adequately developed the record, and the result in this case was neither unfair nor prejudicial to plaintiff.

The ALJ specifically cited plaintiff's treatment records from the clinic, which documented his medical treatment from October 2003 through July 2004.[13] The ALJ noted that radiological studies

---

[13]Although the ALJ did not specifically cite the clinic records dated August 18, 2004 through November 4, 2004, which were sent to the ALJ following the hearing, the undersigned cannot conclude that the ALJ failed to consider them. Although the ALJ is required to develop the record fully and fairly, the ALJ is not required to discuss in detail every piece of evidence submitted, and a failure to cite to certain evidence does not mean it was not considered. Brewster v. Barnhart, 366 F.Supp. 2d 858, 872 (E.D. Mo., 2005); citing Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998).

of plaintiff's left knee and lungs revealed no significant problems. (Tr. 138.) The ALJ further noted that plaintiff's diabetes was controlled with insulin, and that there was no evidence of exacerbation of any of plaintiff's conditions. Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) (impairments controllable or amenable to treatment do not support a finding of total disability). The ALJ also noted the lack of any evidence of significant clinical signs of any debilitating condition, and noted that plaintiff did not require strong pain medication. Haynes v. Shalala, 26 F.3d 812, 814 (8th Cir. 1994) (a lack of strong pain medication is inconsistent with subjective complaints of disabling pain). The ALJ also reviewed the records from the Missouri Department of Corrections, and noted that they indicated that plaintiff was seen mainly for remedial medical conditions, such as diabetic maintenance, gastro-esophageal symptoms, and an upper respiratory infection.

Furthermore, the record demonstrates that the ALJ exercised diligence in ensuring a fully and fairly developed record. Following the hearing, at the request of plaintiff's attorney, the ALJ left the record open to await receipt of additional medical and academic records. Upon noticing that some of the promised records had not been submitted, the ALJ wrote to plaintiff's attorney on two occasions requesting the materials.

In the case at bar, the record contained substantial evidence to support the ALJ's decision. "An ALJ is permitted to

issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision." Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995); quoting Naber v. Shalala, 22 F.3d 186, 189 (8th Cir. 1994). "Reversal due to failure to develop the record is only warranted where such failure is unfair or prejudicial." Shannon v. Chater, 54 F.3d 484, 488 (8th Cir. 1995); citing Onstad v. Shalala, 999 F.2d 1232, 1234 (8th Cir. 1993). Plaintiff has made no such showing. Therefore, the ALJ did not err in failing to send the plaintiff for a consultative examination.

B.    Credibility Determination

Plaintiff next contends that the ALJ improperly relied upon his personal observations in assessing plaintiff's credibility, and also argues that the ALJ ignored treatment records indicating findings of neuropathy. Regarding the ALJ's personal observations, plaintiff cites the following text from the ALJ's decision: "Claimant's appearance at the hearing did nothing to add to the weight of the allegations of disability. The undersigned did not observe credible signs of significant motor deficits or serious discomfort during the hearing." (Plaintiff's brief (Doc. No. 8) at 10, citing Tr. 15.)

"A claimant has the burden of proving that his disability results from a medically determinable physical or mental impairment." Polaski v. Heckler, 739 F.2d 1320, 1321 (8th Cir. 1984). However, testimony regarding pain is necessarily subjective

in nature, as it is the Plaintiff's own perception of the effects of his alleged physical impairment.  Id.; Halpin v. Shalala, 999 F.2d 342, 346 (8th Cir. 1993).  Because of the subjective nature of physical symptoms, and the absence of any reliable technique for their measurement, it is difficult to prove, disprove or quantify their existence and/or overall effect.  Id. at 1321-22.  The Eighth Circuit addressed this difficulty in Polaski, and established the following standard for the evaluation of subjective complaints:

> "The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; (5) functional restrictions."

> Id. at 1322.

Although the ALJ is not free to accept or reject the claimant's subjective complaints based solely upon personal observations, he or she may discount such complaints if there are inconsistencies in the evidence as a whole.  Id.  "The ALJ's personal observations of the claimant's demeanor during the hearing is completely proper in making credibility determinations."  Johnson, 240 F.3d at 1147-48; citing Smith v. Shalala, 987 F.2d

1371, 1375 (8th Cir. 1993). When an ALJ explicitly considers the _Polaski_ factors and discredits a claimant's complaints for a good reason, that decision should be upheld. _Hogan v. Apfel_, 239 F.3d 958, 962 (8th Cir. 2001). The credibility of a claimant's subjective testimony is primarily for the ALJ, not the courts, to decide, and the court considers with deference the ALJ's decision on the subject. _Tellez v. Barnhart_, 403 F.3d 953, 957 (8th Cir. 2005).

In the instant matter, although the ALJ did not cite _Polaski_ by name, he listed all of the necessary factors therefrom, and specifically cited 20 C.F.R. §§ 404.1529 and 416.929, the regulations corresponding with _Polaski_ and credibility determination. (Tr. 13.) The ALJ set forth numerous inconsistencies in the record to support his conclusion that plaintiff's subjective complaints were not credible.

The ALJ noted that no doctor who treated or examined plaintiff either stated or implied that plaintiff was totally incapacitated, or imposed any specific work restrictions, despite plaintiff's testimony that he was totally incapacitated from work. (Tr. 15.) Similarly, the ALJ noted that plaintiff's daily activities were restricted largely by plaintiff's own choice, rather than by any apparent medical proscription. _Id._; _Choate v. Barnhart_, 457 F.3d 865, 871 (8th Cir. 2006) (ALJ properly discredited Plaintiff's testimony regarding self-limitation of physical activities when such limitations were inconsistent with the medical

records).  The ALJ further noted that plaintiff had not been
hospitalized or referred for physical therapy at any time relevant
to the decision, and that plaintiff did not take strong doses of
medication.  Id.; Haynes, 26 F.3d at 814 (a lack of strong pain
medication is inconsistent with subjective complaints of disabling
pain).

      The ALJ also noted the absence of significant clinical
signs typically associated with chronic pain; namely, there was no
objective evidence of muscle atrophy, bowel or bladder dysfunction,
severe and persistent muscle spasms, neurological deficits, or
inflammatory signs.  See 20 C.F.R. §§ 404.1529(a), 404.1528(b).
Plaintiff challenges the ALJ's finding regarding the lack of
demonstrated neurological deficits, noting plaintiff's October 30,
2004 and January 30, 2004 clinic visits in which neuropathy was
indicated.  (Plaintiff's brief (Doc. No. 8) at 11, citing Tr. 124-
27).  However, the undersigned notes that, on these two occasions,
plaintiff was treated conservatively, and no limitations were placed
on his activities.  (Tr. 124-27);  Black, 143 F.3d at 386
(conservative treatment is inconsistent with allegations of
disabling pain).

      Following his discussion of the foregoing, the ALJ added
his own personal observations of plaintiff's appearance at the
hearing.  (Tr. 15.)  It is clear that the ALJ did not base his
credibility determination solely upon his personal observations of
plaintiff's appearance and demeanor.  It is proper for an ALJ to use

his own personal observations in making credibility determinations. Johnson, 240 F.3d at 1147-48, citing Smith, 987 F.2d at 1375.

A review of the ALJ's decision shows that, in a manner consistent with and as required by Polaski, the ALJ considered plaintiff's subjective complaints on the basis of the entire record before him, and set out inconsistencies detracting from plaintiff's credibility. The ALJ may disbelieve subjective complaints where there are inconsistencies on the record as a whole. Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990). The inconsistencies noted by the undersigned, supra, provide further support for the ALJ's credibility determination. Because the ALJ's credibility determination is supported by good reasons and substantial evidence on the record as a whole, this Court must defer to the ALJ's credibility determination. Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992); Hogan, 239 F.3d at 962.

Therefore, for all of the foregoing reasons,

**IT IS HEREBY ORDERED** that the decision of the Commissioner be affirmed and that plaintiff's Complaint be dismissed with prejudice.

Judgment shall be entered accordingly.

_Frederick R. Buckles_
UNITED STATES MAGISTRATE JUDGE


Dated this 26th day of September, 2006